MICHAEL J. FAHY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fahy v. Commissioner
Docket No. 11183-76.
United States Tax Court
T.C. Memo 1982-37; 1982 Tax Ct. Memo LEXIS 704; 43 T.C.M. (CCH) 387; T.C.M. (RIA) 82037; January 29, 1982. *704 For 1970, 1971, and 1972, petitioner filed with respondent the first page of a Form 1040 and various attachments, in which petitioner asserts a variety of constitutional objections to the Federal income tax laws. For 1973, petitioner filed a Form 1040 in which he relies on the Fifth Amendment. None of these forms was signed under penalties of perjury, or provides information from which petitioner's tax liability could be computed. Petitioner did not file an income tax return for 1974. Beginning in 1971, petitioner told his business suppliers and banks to provide to tax officials no information pertaining to petitioner's Federal income tax liabilities. He sold his business to a corporation created by his wife. He agreed with this corporation that no taxes were to be withheld from his compensation under a "consulting agreement". He gave his real estate to his wife. He closed his bank accounts. He paid no Federal income taxes. Held: (1) The documents filed by petitioner do not constitute "returns"; the statute of limitations does not bar assessment of deficiencies. Sec. 6501(c)(3), I.R.C. 1954. (2) Petitioner is liable for deficiencies; petitioner's constitutional arguments *705 are rejected. (3) Additions to tax are imposed under section 6653(b) (fraud), I.R.C. 1954, for 1971 through 1974, but not for 1970. (4) Additions to tax are imposed under section 6654(a) (estimated tax), I.R.C. 1954. Michael J. Fahy, pro se. Anthony M. Bruce, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6653(b)[1] (fraud) and 6654(a) (estimated tax) against petitioner as follows: Additions to Tax
Year
Deficiency
Section 6653(b)
Section 6654(a)
1970
$ 7,195.04
$ 3,597.52
$ 230.24
1971
9,521.86
4,760.93
304.68
1972
8,332.42
4,166.21
266.61
1973
6,245.40
3,122.70
199.83
1974
350.13
175.07
11.20 After concessions, [2] the issues for decision are as follows: (1) *706 whether the statute of limitations bars assessment of deficiencies against petitioner; (2) whether petitioner is liable for deficiencies; (3) whether petitioner is liable for additions to tax under section 6653(b); and (4) whether petitioner is liable for additions to tax under section 6654(a). FINDINGS OF FACT Some of the facts have been admitted, deemed admitted under Rule 90(d), [3] stipulated, or deemed stipulated under Rule 91(f); [4] *707 the admissions, stipulations, and stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in Sauquoit, New York. During all of 1970, 1971, and 1972, and part of 1973, petitioner owned and operated M.J. Fahy Kitchens (hereinafter sometimes referred to as "Kitchens"), a proprietorship with stores in Utica, New York, and Chadwicks, New York. Kitchens was engaged in the business of designing and building custom kitchens and remodeling existing kitchens. On or about June 1, 1973, Fahy Kitchens, Inc. (hereinafter sometimes referred to as "Fahy, Inc."), was incorporated in the State of New York by petitioner's wife. About that time, all of Kitchens' assets were transferred to Fahy, Inc. The bill of sale for this transfer, dated June 8, 1973, states in part as follows: THAT M.J. FAHY KITCHENS party of the first part, for and in consideration of the sum of Twenty Thousand and no/100----(20,000.00) Dollars, Lawful money of the United States to it in hand paid, at or before the ensealing and delivery of these presents by FAHY KITCHENS, INC. on the giving of a promissory note from FAHY KITCHENS, INC. to M.J. FAHY KITCHENS, in the amount of Sixteen Thousand, six hundred and thirty eight and 49/100 *708 ($ 16,638.49) Dollars and $ 3,361.51 making a total of $ 20,000.00. partyof the second part, the receipt whereof is hereby acknowledged has bargained and sold, and by these presents does grant and convey unto the said party of the second part, its heirs, executors, administrators, successors and assigns * * *. [The underscored material was preprinted on the bill of sale form; the other material was typed onto the form.] The affidavit which is part of the document is signed by petitioner and attests that he executed the bill of sale. Under an "AGREEMENT AND CONTRACT FOR INDEPENDENT OR SUBCONTRACTOR" (hereinafter referred to as "the consulting agreement"), dated June 1, 1973, petitioner became associated with Fahy, Inc., in an advisor-consultant capacity. The consulting agreement provided in part as follows: 2. That the Party of the second part [petitioner] will be compensated as follows: Twelve Hundred Dollars per month. 6. Second Party agrees to accept full responsibility for any and all taxes that may be lawfully due to any governmental unit and to hold Party of the First Part [Fahy, Inc.] harmless from any liability from the non-payment of taxes due from Second Party to any *709 governmental unit. When Fahy, Inc., paid petitioner for his services, it paid him either in Federal Reserve Notes or in checks. For 1970, 1971, 1972, and that portion of 1973 during which petitioner operated Kitchens, petitioner kept records of his income and expenses. For the last six months of 1973 and for 1974, petitioner did not keep records of his income and expenses. During all of 1971 and 1972, and part of 1973, petitioner maintained a business checking account in the name of "M.J. Fahy Company" at Oneida National Bank and Trust Company (hereinafter referred to as "Oneida"); this account was used on a regular basis until mid-1973, and then on a sporadic basis until October 17, 1973, when it was closed. During all of 1971 and part of 1972, petitioner maintained a personal checking account at Marine Midland Trust Company (hereinafter referred to as "Marine Midland"); this account was used on a regular basis throughout 1971, and then on a sporadic basis until April 5, 1972, when it was closed. From December 14, 1971, onward, petitioner maintained a personal checking account at Oneida; this account was used on a regular basis until May 10, 1972, when activity ceased; it was *710 closed in August 1972. Petitioner has not maintained any bank accounts since October 17, 1973, when the business checking account at Oneida was closed. On April 13, 1972, petitioner executed three quitclaim deeds conveying to his wife all of petitioner's interest in the following parcels of real estate: (1) petitioner's and his wife's residence owned solely by petitioner, (2) an apartment building in Utica, New York, owned solely by petitioner, and (3) an apartment building in Utica, New York, owned jointly by petitioner and his wife. Each parcel was conveyed subject to mortgages, but for no consideration. A net worth statement (as of June 11, 1969) provided by petitioner to Marine Midland showed the values of the first and second parcels as $ 25,000 each, subject to mortgages of $ 6,300 and $ 6,000, respectively; the third parcel was acquired by petitioner and his wife shortly after the date of the net worth statement. From the late 1930's through 1969, petitioner regularly filed income tax returns. Petitioner's and wife's joint Federal income tax returns for 1966, 1967, 1968, and 1969 show adjusted gross income, taxable income, and total tax (including self-employment tax), *711 as set forth in table 1. Table 1 Adjusted
Taxable
Total
Year
Gross Income
Income
Tax
1966
$ 4,777.28
$ 1,251.80
$ 376.68
1967
5,474.34
2,021.68
588.35
1968
8,008.83
3,600.47
966.96
1969
14,692.14
10,695.51
2,513.80
For 1970, petitioner filed with respondent the first page of a 1970 Form 1040 with 7 exhibits attached. The Form 1040 was signed by petitioner and is dated April 15, 1971; it shows petitioner's name, address, social security number, occupation (self-employed), and filing status (single). Line 25 (Total tax liability) of the Form 1040 contains the notation, "SEE EXHIBITS A, B, C, D, E, F, G, H," [5]--the remaining lines are blank. Exhibit A is a statement of petitioner's objections to the Federal income tax laws based on his understanding of the meaning of "dollar" and based on the 1st, 5th, 14th, and 16th Amendments to the United States Constitution, including the following statements: I wish to state that I earned less than $ 600.00 in constitutional, lawful United States money in the year 1970, and therefore owe no income tax. (Exhibit B) I further wish to state that even if I had earned $ 600.00 in lawful United States money, I would have to refuse *712 payment of any income tax because I would be compelled thereby to participate in a program which is killing thousands of unborn children. This would be a violation of my rights under the first amendment * * *. Another reason I would have refused payment of income taxes, had I earned $ 600.00 in lawful Unted States money, is the many inequities and loopholes which operate to deprive me of equal justice under the law. Exhibit B is a copy of two documents relating to a judicial proceeding in a Minnesota township justice of the peace court involving one Jerome Daly. Exhibits C, D, E, F, and G are copies of excerpts from newspaper or church newsletter articles (and photographs) regarding abortion. For 1971, petitioner filed with respondent a 12-page document with the following attached: (1) substantially the same 7 exhibits [6] as are attached to petitioner's 1970 Form 1040, and (2) a 72-page publication, "The Daly Eagle" (May 1971). The first page of the document is the first page of a 1971 Form 1040 which was signed by petitioner and is dated April 18, 1972; it shows petitioner's name, address, social security number, occupation (Businessman), filing status (married filing separately), *713 three personal exemptions, "585" on the line for income other than wages, dividends, and interest, "585" on the line for adjusted gross income, "O" on the line for income tax, "O" on the line for balance due, the notation "(Note) See 11 pages and 'Daly Eagle' of May 1, 1971 attached" at line 12, and the notation "ALSO SEE EXHIBITS 'A' THRU 'G' ON ABORTION" at line 15. The remaining 11 pages of the document contain various constitutional objections to Federal income tax and copies of excerpts from statutes and provisions of the Minnesota and United States constitutions. The document includes the following: The money of Account of the United States as expressed in Dollars or Units, dimes or tenths, cents or hundreths, and mills or thousandths, as coined by Act of Congress with the standard of the weights and measures of the precious metals, gold and silver therein fixed by act of Congress received *714 [sic] by the undersigned for the year in question are as follows: Gold Eagles, Units or Dollars
No.
Silver Dollars
No.
Silver Half Dollars
No.
$ 500
Silver Quarters
No.
$ 80
Silver Half Dimes
No.
[7] $ 5
NicKles [sic]
No.
Pennies or Cents
No.
Silver Dimes
No.
TOTAL INCOME AS EXPRESSED IN MONIES OF ACCOUNT OF THE U.S. § 585 To be perfectly clear the above figures or this return does not include the report of or the receipt of or the use of check book, or Federal Reserve Notes or paper so called money of any form that is not readily redeemable in gold and silver coin or specie. Also this return does not include silver clad copper coins for the reason that it might tend to incriminate me, under either State or Federal Law. For 1972, petitioner filed with respondent the first page of a 1972 Form 1040, attached to which are copies of the same 7 exhibits which are attached to petitioner's document for 1971. The Form 1040 is dated April 15, 1973, and was signed by petitioner; it shows petitioner's name address, social security number, occupation *715 (self-employed), filing status (married filing separately), and one personal exemption--all other lines on the form are blank. Attached to the face of the Form 1040 is a statement, signed by petitioner, in which petitioner objects to Federal income tax under the 1st, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 13th, and 14th Amendments to the United States Constitution. For 1973, petitioner filed with respondent a 1973 Form 1040 (2 pages) which was signed by petitioner, but is undated; it shows petitioner's name, address, social security number, and filing status (married filing separately). Of the remaining lines on the Form 1040, a few are blank and the balance contain a reference to the Fifth Amendment. On each of the above-described Forms 1040, the words "under penalties of perjury" have been crossed out above petitioner's signature. Petitioner has not filed income tax returns, or any documents purporting to be income tax returns, with respondent for 1974, 1975, 1976, and 1977. Petitioner made no payments of income tax (including self-employment tax), estimated or otherwise, for 1970, 1971, 1972, 1973, and 1974. In or about June 1971, petitioner sent to one of Kitchens' suppliers, *716 Serway Brothers, Inc. (hereinafter sometimes referred to as "Serway"), a copy of a letter containing the following: You and anyone associated with you are hereby requested to give no information concerning my account, my income, my sources of income, my credit standing, or my personnel business affairs to anyone, and agency on any business concern unless you have my express written permission to do so.
If anyone contacts you (even if that person is an Internal Revenue Agent, an F.B.I. agent, a State Revenue Agent or whoever else he might be [sic] you must not violate the above trust. If anyone attempts to make you reveal any of the above information, concerning my personnel or business affairs, I request that you refuse even if you are served some legal-looking document. To obtain information from you certain individuals may even go to such extremes as to use scare-tactics and even duress, "under color of law", in order to achieve their objectives. You have every Constitutional right to refuse on "grounds that such an answer might tend to incriminate you". * * *
Petitioner sent similar letters during 1971 to two other suppliers and to the two banks with which he dealt (Oneida and Marine *717 Midland). In 1973, after Fahy, Inc., was organized, petitioner telephoned Serway's president to tell him of the change in petioner's business operations and to remind him of petitioner's 1971 request that he not disclose information regarding petitioner's account. Petitioner followed up the telephone conversation with a reminder letter to which was attached a copy of the 1971 letter.
Petitioner made the requests contained in these letters in anticipation of investigations by Federal and State tax authorities. On September 30, 1974, respondent's revenue agent, Kenneth Daniels (hereinafter referred to as "Daniels"), telephoned petitioner for the purpose of conducting a general audit of petitioner's income taxes for 1971 and 1972. Daniels encountered some difficulty in setting up an appointment with petitioner, but an appointment was ultimately agreed upon for November 7, 1974, at which time Daniels met petitioner at petitioner's place of business. When Daniels attempted to commence the audit, petitioner requested that he be permitted to tape-record the conversation. Initially, Daniels objected to the use of a tape-recorder by petitioner unless Daniels also had a tape-recorder, and *718 when petitioner declined to stop recording, Daniels left the meeting. Upon returning to his office, Daniels learned that Internal Revenue Service policy prohibited use of a tape-recorder during the audit, and so advised petitioner. Later that day, Daniels served petitioner with a summons for his books and records; petitioner told Daniels he would not comply with the summons and gave Daniels a copy of a Justice Department letter regarding summons enforcement proceedings in another taxpayer's case, and a pamphlet containing, inter alia, the Declaration of Independence, the Constitution of the United States, and a proposed amendment to the Constitution. [8] In a letter to Daniels dated November 20, 1974, petitioner stated that he would not honor the summons because the "summons is illegal", and challenged the constitutionality of the Internal Revenue Code. Another meeting was scheduled for April 24, 1975, at respondent's office, but petitioner left when he again was not permitted to tape-record the conversation. In a letter to Daniels dated May 12, 1975, petitioner stated that, had he been permitted to tape-record the April 24, 1975, meeting, he would have presented for Daniels' consideration *719 some cases and other materials supporting the proposition that a taxpayer may refuse to make statements or produce his records under the Fifth Amendment. Respondent sought Federal district court enforcement of a summons against petitioner, but on June 9, 1975, enforcement was denied without prejudice. [9]
Since Daniels was unable to obtain any tax information from petitioner for the years under audit, Daniels sought petitioner's tax information from third parties. Daniels canvassed the banks in the Utica, New York, area and discovered the two Oneida accounts and the Marine Midland account. Daniels also learned that petitioner had done business with Serway during the years under audit. Summonses were issued by respondent to the two banks and to Serway in connection with Daniels' investigation of petitioner. Petitioner intervened in and instituted litigation concerning these summonses in unsuccessful attempts to prevent respondent *720 from obtaining the requested information. After Daniels had enough information to complete his examination, he called petitioner to discuss his findings. Respondent consented to having a verbatim transcript made of any meetings with petitioner. Petitioner consented, but only if the clerk or recording device was at respondent's expense. No such meeting was held, and no further meetings were held between petitioner and Daniels. The notice of deficiency in the instant case was mailed to petitioner on September 30, 1976. Petitioner had taxable income for 1970 through 1973 and adjusted gross income for 1974 in the amounts set forth in table 2. Table 2 Taxable
Adjusted
Year
Income
Gross
Income
1970
$ 430.76
1971
7,355.77
1972
5,762.45
1973
10,878.15
1974
$ 2,188.00
During the period 1969 through 1974, petitioner made statements to others that he had not paid income tax in the past based on his religious beliefs about abortion and that he would not pay taxes in the future because of these beliefs. Petitioner made conscious decisions, based on his beliefs about abortion and Federal Reserve Notes, to file with respondent the documents he filed for 1970, 1971, 1972, and 1973, and to not file with respondent *721 any tax return or document for 1974. Petitioner was aware of his obligations to file Federal income tax returns for the years before the Court, at the times that such returns were to be filed. Petitioner failed to file Federal income tax returns for each of the years 1970 through 1974. A part of petitioner's underpayment of tax for each of the years 1971, 1972, 1973, and 1974 was due to fraud. OPINION I. Statute of Limitations
In his petition, petitioner asserts that the statute of limitations expired as to each of the years 1970 through 1973. Respondent asserts that the statute of limitations does not bar assessments of deficiencies for these years because (1) petitioner committed fraud for each of these years, (2) the documents filed by petitioner did not constitute tax returns, and (3) as to 1973, the notice of deficiency was mailed before the expiration of the limitations period. We agree with respondent's second assertion. [10] *722 Section 6501(a)[11] *723 provides the general rule that an assessment of tax must be made within three years after the return was filed. However, if no return has been filed, an assessment of tax may be made at any time. (Sec. 6501(c)(3). [12]) Under settled law, the documents filed by petitioner for 1970 through 1973 are not income tax returns within the meaning of section 6501. In order to file a valid return, the taxpayer must sign and verify the return under penalties of perjury ( Cupp v. Commissioner, 65 T.C. 68, 73, 78-79 (1975), affd. without published opinion 559 F.2d 1207 (CA3 1977)) and provide on the return sufficient data from which respondent can compute and assess the taxpayer's tax liability (Reiff v. Commissioner, 77 T.C.     (Nov. 30, 1981)). None of the documents filed by petitioner for 1970 through 1973 satisfies these requirements. None was signed under penalties of perjury. The filings for 1970, 1972, and 1973 provide no financial information at all. Although the Form 1040 portion of petitioner's document for 1971 shows "585" as the amount of "other" income and as the amount of adjusted gross income, the statements *724 in the document effectively repudiate the correctness of these amounts by stating that the "585" represents only silver coins and not checks, Federal Reserve Ntes, or "paper so called money" received by petitioner. We conclude that petitioner's document for 1971 also does not provide sufficient data from which respondent could compute and assess petitioner's income tax liability for the year. Similarly, petitioner's blanket Fifth Amendment claims asserted on his 1973 Form 1040 do not discharge petitioner from his obligation to provide respondent with the requisite data. E.g., Reiff v. Commissioner,supra; White v. Commissioner,72 T.C. 1126, 1130 (1979). Petitioner has presented no evidence indicating a reasonable basis for fearing that his tax return information would tend to incriminate him. Since for each year in issue petitioner did not file an income tax return, assessments of income tax for these years may be made at any time. Sec. 6501(c)(3). See Gajewski v. Commissioner,67 T.C. 181, 191-192 (1976), affd. without published opinion 578 F.2d 1383 (CA8 1978). On this issue, we hold for respondent. II. Deficiencies
The parties have agreed to the amounts of deficiency for *725 each year in issue (see note 2, supra). However, petitioner contends that he is not liable for any tax for these years on the grounds that (1) the payment of Federal income tax violates his First Amendment right to freedom of religion because Federal monies are used for abortion, which his religion considers to be murder, (2) the Federal income tax is unconstitutional, (3) income from labor cannot constitutionally be subject to Federal income tax, and (4) the requirement that petitioner file a Form 1040 showing amounts in dollars seeks to compel petitioner to commit perjury because Federal Reserve Notes are not dollars. Respondent asserts that petitioner's contentions are generalized constitutional attacks on the Internal Revenue Code which have been rejected numerous times by the courts. We agree with respondent. On many occasions, this Court and others have rejected objections to the requirements of the Internal Revenue Code based on a taxpayer's religious and moral beliefs which oppose the policies of the Federal government and its expenditures of funds. E.g., Graves v. Commissioner,579 F.2d 392 (CA6 1978), affg. a Memorandum Opinion of this Court; [13]Greenberg v. Commissioner,73 T.C. 806, 810-811 (1980), *726 and cases cited therein. Petitioner has given us no persuasive reason to depart from the analyses of these cases. Petitioner's remaining arguments are, by now, clearly frivolous. E.g., Brushaber v. Union Pac. R.R.,240 U.S. 1 (1916) (constitutionality of the Federal income tax laws generally); Commissioner v. Duberstein,363 U.S. 278 (1960); Old Colony Tr. Co. v. Commissioner,279 U.S. 716 (1929) (compensation for services, in whatever form received, taxable); White v. Commissioner,72 T.C. at 1128-1129, and cases cited therein (Federal Reserve Notes includible in income). We conclude that the taxes imposed on petitioner by the Internal Revenue Code and the requirement that he file tax returns and pay taxes are not in violation of the Constitution. Muste v. Commissioner,35 T.C. 913, 919 (1961). Accordingly, petitioner is liable for deficiencies in the amounts stipulated to by the parties (see note 2, supra). On this issue, we hold for respondent. III. Section 6653(b) Additons to Tax
Respondent determined that all or a part of an underpayment in petitioner's income taxes for each of the years in issue was due to fraud. Petitioner denies that any underpayment *727 in income tax for the years in issue was due to fraud. We agree with respondent as to 1971, 1972, 1973, and 1974. We agree with petitioner as to 1970. For each year in issue, petitioner has an underpayment [14] *729 equal to his redetermined deficiency in income tax for that year. See note 2, supraIn order to sustain his determination as to the fraud addition to tax [15] for a year, respondent must prove, by clear and convincing evidence, that some part of the underpayment for that year is due to fraud. Sec. 7454(a); [16] Rule 142(b); e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). Where fraud is asserted for each of several years, respondent's burden applies separately to each of the years. Estate of Stein v. Commissioner,25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner,250 F.2d 798 (CA2 1958). Respondent need not prove the precise amount of the underpayment that results from fraud, but only that some part of it is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (CA7 1972), affg. a Memorandum Opinion of this Court; [17]Lowy v. Commissioner,288 F.2d 517 (CA2 1961), *728 affg. a Memorandum Opinion of this Court; [18]Otsuki v. Commissioner,53 T.C. at 105; Estate of Brame v. Commissioner,25 T.C. 824, 831-832 (1956), affd. 256 F.2d 343 (CA5 1958). The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner,supra;Mensik v. Commissioner,328 F.2d 147, 150 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224; Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [19]Powell v. Granquist,252 F.2d 56, 60 (CA9 1958); Wiseley v. Commissioner,185 F.2d 263, 266 (CA6 1950), revg. 13 T.C. 253 (1949); Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); *730 McGee v. Commissioner,61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence. Powell v. Granquist,252 F.2d at 61; Gajewski v. Commissioner,67 T.C. at 200; Beaver v. Comissioner,55 T.C. 85, 92-93 (1970). Viewing the record as a whole, we conclude that respondent has sustained his burden of showing fraud by clear and convincing evidence for each of the years 1971, 1972, 1973, and 1974. We further conclude that respondent has failed to sustain his burden for 1970. A pattern of not filing income tax returns, coupled with convincing affirmative indications of a specific intent to defraud, is sufficient to satisfy respondent's burden of proof. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980), on appeal (CA7 Dec. 22, 1981). We believe the following factors point toward a fraudulent intent by petitioner: (1) For some 30 years, ending with 1969, petitioner filed income tax returns. For 1970 through 1973, petitioner filed documents which we hold did not constitute income tax returns. From 1974 onward, petitioner filed no documents purporting to be tax returns. Petitioner's three decades of tax *731 return filings, including the detailed joint returns filed with his wife for 1966 through 1969 (see table 1, supra), convince us that, for the years before the Court, he understood the obligation to file annual returns. The documents he filed for 1970 through 1973 flaunted his refusal to cooperate with the income tax system established by the Congress. For 1974 and thereafter, petitioner did not even file his annual flaunting. Nothing in petitioner's actions for any of the years before the Court, as they relate to the documents filed for 1970 through 1973 or the failure to file any document for 1974, indicates a desire to test in the courts the legality or constitutionality of any action by the Congress or respondent. Cf. Muste v. Commissioner, 35 T.C. at 920-921. Rather, petitioner's actions in this respect are consistent with a desire to evade payment of income taxes and to increase the likelihood of the success of such evasion by failing to provide the information from which such income tax liabilities could be determined by respondent. Petitioner's actions are affirmative indications of fraud. (2) Petitioner established a pattern of failing to make tax payments, estimated *732 or otherwise, for 1970 through 1974. The documents that petitioner filed showed that he intended to diminish the tax dollars available for Federal spending for abortion. See United States v. Malinowski, 472 F.2d 850, 858-859 (CA3 1973). The consulting agreement facilitated petitioner's pattern of nonpayment of taxes by requiring Fahy, Inc. , not to withhold taxes from payments made to petitioner for his services to Fahy, Inc.These documents and the consulting agreement make it clear that petitioner sought to prevent the payment of his income tax liabilities. If respondent had not taken steps (over petitioner's strenuous opposition) which ultimately led to the instant case, petitioner would have succeeded in his purpose of not paying his income tax liabilities. (3) Petitioner took a series of actions evidently designed to conceal both his assets and his records. In or about June 1971, he wrote to suppliers and banks, asking them to refuse to disclose any information about him to officials who might be investigating his taxes. Continuing with this pattern, on April 5, 1972, petitioner closed his Marine Midland Bank account. On April 13, 1972, petitioner transferred all of his interest *733 in real estate to his wife. [20] By May 10, 1972, petitioner ceased the use of his Oneida personal account. In June 1973, Fahy, Inc., was formed, petitioner entered the no-withholding consulting agreement with Fahy, Inc., and Kitchens' assets were sold to Fahy, Inc. Shortly thereafter, petitioner ceased the use of his Oneida business account. He sent reminder letters to suppliers and creditors urging them to refuse to cooperate with tax authorities, and he stopped keeping business records. He refused to make available to respondent's agents those books and records that he had maintained.Such efforts to impede, rather than cooperate with, the verification of income subject to tax constitute indicia of fraud. United States v. Eley, 314 F.2d 127, 132 (CA7 1963); Millikin v. Commissioner, 298 F.2d 830, 836 (CA4 1962), affg. a Memorandum Opinion of this Court; [21]Granat's Estate v. Commissioner, 298 F.2d 397 (CA2 1962), affg. a Memorandum Opinion of this Court; [22]Powell v. Granquist, 252 F.2d at 59, 61; Grosshandler v. Commissioner, 75 T.C. at 20; Gajewski v. Commissioner, 67 T.C. at 200. Cf. United States v. Foster, 309 F.2d 8, 14 (CA4 1962); Stratton v. Commissioner, 54 T.C. at 287; *734 Muste v. Commissioner, 35 T.C. at 921. (4) Petitioner makes much of his insistence that he believed that little of what he received was "lawful money". In the documents he filed as purported tax returns, he expanded on his uncertainty as to the meaning of the word "dollars" and the symbol "$". Yet, petitioner had no difficulty in understanding and using such symbols when, for example, he entered into the consulting agreement obligating Fahy, Inc., to pay him "Twelve Hundred Dollars per month." Similarly, he had no difficulty in using the word and the symbol at numerous points in the bill of sale for Kitchens' sale of assets and liabilities to Fahy, Inc. We find no evidence in the record suggesting that petitioner was able to conduct his proprietorship before the sale to Fahy, Inc., and deal with suppliers and customers, without the use of the word "dollars" and the symbol "$". On an attachment *735 to his 1971 Form 1040, petitioner specifically noted that the document he filed "does not include the report of or the receipt of or the use of any check book, or Federal Reserve Notes or paper so called money of any form that is not readily redeemable in gold and silver coin or specie." Yet, during 1971, petitioner actively maintained two checking accounts--a business account at Oneida and a personal account at Marine Midland--and used as things of value the very sort of instruments whose value he refused to report on tax returns. Petitioner acknowledged at trial that Federal Reserve Notes had value, but insisted that he could not state on his Forms 1040 that the Federal Reserve Notes he received were dollars, because the Forms 1040 were to be signed under penalties of perjury. We might have believed this explanation if petitioner had provided information on income tax returns as to his income in terms of Federal Reserve Notes, but he provided no relevant information based on anyone's definition of "dollar", and he nevertheless took care to strike out the penalties of perjury language on the Forms 1040. In short, we do not believe petitioner's professed befuddlement as to what he *736 should report as income and so we do not believe that petitioner's errors resulted simply from an honest mistake. We conclude that petitioner knew what he was doing--i.e., that petitioner was evading the payment of his Federal income tax liability ( United States v. Pomponio, 429 U.S. 10, 12 (1976)); that he was taking steps to reduce the likelihood that he would be caught; and that he was taking steps to reduce the likelihood that, if he were caught, he would have to pay the taxes he owed. For each of the years 1971, 1972, 1973, and 1974, we believe that petitioner's fraud has been shown by clear and convincing evidence. For 1970, however, we have no action pointing to fraud beyond the purported 1970 tax return. The purported return is itself an indicator of fraudulent intent. Were it not for the extraordinary burden of proof imposed on respondent with respect to fraud (as distinguished from, for example, the burden of proof with respect to "new matter"), we would agree with respondent as to 1970, also. Because of the high burden of proof and the absence of other evidence as to 1970, we conclude that respondent's evidence as to fraud for 1970 is not sufficiently clear and convincing. *737 See Drieborg v. Commissioner, 225 F.2d 216, 219-220 (CA6 1955), revg. an unreported Memorandum Opinion of this Court. On this issue, we hold for petitioner as to 1970 and we hold for respondent as to each of the years 1971, 1972, 1973, and 1974. (See n. 2, supra, for the amounts of the additions.) IV. Section 6654 Additions to Tax
Petitioner has the burden of proving error in respondent's determination that additions to tax should be imposed under section 6654(a). [23] *738 Hollman v. Commissioner, 38 T.C. 251, 263 (1962). Petitioner has failed to introduce any evidence indicating that respondent so erred. We conclude that petitioner is liable for additions to tax under section 6654(a) in the amounts set forth in note 2, supra. On this issue, we hold for respondent. On answering brief, petitioner charges that respondent "knowingly withheld from the Court evidence which ultimately resulted in a greatly lower determination for the years 1972 and 1973." Petitioner charges that respondent thereby violated section 7214. We are not aware of any such withholding of evidence by respondent's counsel or any acts by him that even arguably violate section 7214. We note that, during the week before the trial and after the trial herein, petitioner finally did show respondent records of some sort and that negotiations between the parties resulted in supplemental stipulations, including those dealt with in note 2 and table 2, supra. We further note that it is petitioner's initial withholding and concealment of this evidence that gave rise to the instant case and extensive formal pretrial proceedings (see note 4, supra). Under the circumstances, we view as frivolous petitioner's prayer that he be compensated for the time he spent on the instant case. See Helvering v. Mitchell, 303 U.S. 391, 401 (1938) *739 (the fraud addition to tax serves "to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud"). To take account of the foregoing holdings and the parties' stipulations, An appropriate decision will be entered. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
2. By stipulation, the parties have agreed to the amounts of (but not the liabilities for) deficiencies in income tax (including self-employment tax) and additions to tax, as follows: ↩
Additions to Tax
Year
Deficiency
Section 6653(b)
Section 6654(a)
1970
$ 167.66
$ 83.83
$ 5.36
1971
2,053.94
1,026.97
65.73
1972
2,071.54
1,035.77
66.29
1973
2,873.26
1,436.66
91.94
1974
285.85
142.93
36.58
3. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. The net effect of numerous discovery documents, proceedings, and orders regarding respondent's request for admissions is that parts of paragraphs 1, 2, 20(a), and 21, and all of paragraphs 4, 5, 10, 15, 16, 17, 18, 19, and 20 of respondent's requested admissions and parts of paragraphs 7, 8, 9, and 13 of respondent's revised requested admissions are deemed admitted. See Burns v. Commissioner,76 T.C. 706 (1981). Also, all of respondent's proposed stipulations, except the last sentence of paragraph 8 and all of paragraph 20, are deemed stipulated for purposes of this case.
5. There is no Exhibit H attached to the form.↩
6. Exhibits A, C, D, E, F, and G are identical; Exhibit B is different and consists of a copy of a newspaper article about a court proceeding involving Jerome Daly with a statement typed on the bottom to the effect that rules and regulations under the Internal Revenue Code are unconstitutional.↩
7. The United States last minted silver half dimes in 1873. See generally Joslin v. United States,     F.2d     ( CA10 Dec. 9, 1981, 49 AFTR 2d 82↩-379, 81-2 USTC par. 9813).
8. This proposed amendment would repeal the Sixteenth Amendment to the Constitution↩ and would prohibit enactment of Federal income, estate, and gift taxes.
9. The district court Judge indicated that petitioner had a right to have a record made of the audit conversation.↩
10. Since we hold that petitioner did not file an income tax return for each of the years in issue, sections 6501(a) (three-year period for assessment beginning with the filing of a return) and 6501(c)(1) (no period of limitation on assessment for a false or fraudulent return) are not applicable. Even if we were to conclude that any of the documents filed for 1971, 1972, or 1973 was a tax return, then the statute of limitations nevertheless would not have run as to these three years because of our holdings, infra, as to fraud (sec. 6501(c)(1)↩). Even if there were no fraud for 1973, the the statute of limitations nevertheless would not have run as to this year because the notice of deficiency was mailed less than three years after the due date of a tax return for this year (secs. 6072(a) and 6501(b)(1)).
11. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. 12. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (3) No return.--In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
13. T.C. Memo. 1976-353↩.
14. SEC. 6653. FAILURE TO PAY TAX. (c) Definition of Underpayment.--For purposes of this section, the term "underpayment" means-- (1) Income, estate, gift, and chapter 42 taxes.--In the case of a tax to which section 6211 (relating to income, estate, gift, and chapter 42 taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * * [The subsequent amendments of this provision by section 1016(a)(18) of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829, 931, do not affect the instant case.] 15. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * ↩
16. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects a 1976 amendment which does not affect the instant case.] ↩
17. T.C. Memo. 1970-274↩. 18. T.C. Memo. 1960-32↩.
19. T.C. Memo. 1966-81↩.
20. Because petitioner's wife was not available to testify at the trial in the instant case, the record was left open so that petitioner could take his wife's deposition and submit it into the record. No such deposition was submitted by petitioner. ↩
21. T.C. Memo. 1959-210↩. 22. T.C. Memo. 1960-171↩.
23. SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) Addition to the Tax.--In the case of any underpayment of estimated tax by an individual except as provided in subsection (d), there shall be added to the tax under chapter 1 * * * for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)). [The subsequent amendment of this provision by section 7(c) of Pub. L. 93-625, 88 Stat. 2115, does not affect the instant case.]